1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  ESTATE OF JAMES LEWIS SLATER       CASE NO. C12-1132-MJP
    JR, et. al.

11                                     ORDER GRANTING
                                         DEFENDANTS' MOTION FOR
                Plaintiffs,             SUMMARY JUDGMENT

12

13            v.

14  KING COUNTY, et. al.

15                  Defendants.

16         This matter comes before the Court on Defendants' motion for motion for summary

17  judgment (Dkt. No. 60), Plaintiffs' motion for partial summary judgment on liability (Dkt. No.

18  65), and Plaintiff's motion for partial summary judgment on section 1983 liability (Dkt. No. 67).

19  Having reviewed the motions, the responses, and all related papers, the Court GRANTS

20  Defendants' motion and Court DENIES Plaintiffs' motions.

21  //

22  //

23  //

24

**Background**

This case involves an officer involved shooting in Woodinville, Wash., by a King County Sherriff's deputy, responding to a domestic violence call at the home of Laura Casablanca and her husband, James Lewis Slater Jr.  Mr. Slater was killed in the shooting.  Plaintiffs Ms. Casablanca, the estate of Mr. Slater, Mr. Slater's father, and his step-daughter filed a complaint against Deputy Peter Cougan and King County for violations under §1983 and other state law claims.

Ms. Casablanca and Mr. Slater were married for eight years.  They had a tumultuous relationship, which included verbal and physical abuse.  On July 4, 2009, Ms. Casablanca arrived home and found Mr. Slater drinking tequila and in a bad mood.  On this night too, Mr. Slater was verbally abusive and punched several objects in the house in anger over Ms. Slater's intent to end the relationship.  At some point that evening, Ms. Casablanca noticed a large knife was missing from Mr. Slater's sword collection.  She also discovered Mr. Slater had cut one of his own wrists.  After taking away the knife and helping him clean up the blood, Ms. Casablanca took the sword collection and placed it in her car.  Mr. Slater went to sleep.  Ms. Casablanca also placed Mr. Slater's shotgun in her car.

Later that evening, Mr. Slater awoke and began physically abusing Ms. Casablanca.  He hit her repeatedly with closed fists and continued to hit her as she fell to the floor.  She managed to call 911. (Dkt. No. 61-2 at 48.)

Deputy Hardin of the King County Sherriff's Department arrived in less than five minutes of Ms. Casablanca's 911 call.  (Dkt. No. 61-1 at 46.)  He explained his first encounter with Ms. Casablanca:  "as I came to the driveway of 16029 NW Woodinville-Duvall Road I met a female… wearing a robe…she has a towel on her face.  There was blood coming from her face.

1    She was crying.  At that time I updated dispatch that I obviously had a good assault here." (Dkt.

2    No. 61-3 at 9.)  Deputy Hardin learned Casablanca had been assaulted by her husband.

3         Deputy Hardin then saw Mr. Slater outside the house.  (Dkt. No. 61-3 at 15.)  Mr. Slater was

4    dressed in khaki shorts and sandals.  He was not wearing a shirt.  (Dkt. No. 61-1 at 45.)  Hardin

5    announced, "Sir, Police."  Mr. Slater looked up, saw the deputy, and ran inside.  (Dkt. No. 61-3

6    at 16.)  Still alone, Deputy Hardin repositioned his car, waited for back up, and watched the

7    house for signs of Mr. Slater.  Hardin learned from Ms. Casablanca that Mr. Slater might be

8    suicidal.  (Dkt. No 61-1 at 49.)  Deputy Hardin then updated dispatch:

9         8:47 p.m. It's a white male wearing ah, khaki shorts, sandals, no shirt, gray hair,
          ponytail. Ah, he ran back inside the house. Wife says he's threatened to kill
10        himself, and he does have access to weapons, guns.

11   Dkt. No. 61-2 at 53.

12        Shortly after, Mr. Slater emerged from the rear of his house and walked east on Woodinville

13   Duvall Road.  (Dkt. No. 61-3 at 23.)  Deputy Hardin followed in his patrol vehicle.  (Id. at 23.)

14   Mr. Slater walked off Woodinville Duvall Road, headed up a slight embankment, and sat down

15   on a wooden bench. (Id. at 27.)  Deputy Hardin got out of the car and saw Mr. Slater holding a

16   large kitchen knife. (Id.)   He could also see that blood was coming down both sides of Mr.

17   Slater's arms and, from the wrist down, he was covered in blood. (Id. at 28.)  Deputy Hardin got

18   on his public address system and announced to Mr. Slater to "get on the ground."  (Id. at 29.)

19   Hardin repeated this request several times.  (Id.)   Deputy Hardin updated dispatch with the

20   following information:

21        8:48 -8:49 He's sitting on his back porch. He's not following any commands. He's
          ah, nice and bloody in the right hand. He wasn't bleeding before.
22        8:50 p.m. William two [Deputy Hardin], he's holding a knife. He's sitting down
          still. He's fine. He's holding a knife.

23

24

1  (Dkt. 61-2.)  Deputy Cougan, already en route, heard this information.  Additional deputies were

2  also dispatched.  (Id.)  Deputy Hardin also told dispatch:

3      8:50:49 I think it's probably a suicide attempt on his part.

4  (Id.)  This statement was also heard by Deputy Cougan.  Within seconds, Deputy Cougan arrived

5  at the scene.  He immediately removed his rifle from the trunk and then discussed the unfolding

6  situation with Deputy Hardin.  (Dkt. No. 61-4 at 21.)  Deputy Hardin told Deputy Cougan that he

7  had seen Mr. Slater with a knife, but it was no longer visible.  Deputy Cougan did not see a

8  knife, but he did observe blood on Mr. Slater's torso.  (Dkt. No. 23-24.)  As the deputies

9  discussed the situation, Mr. Slater got up from the bench and began moving in an easterly

10  direction down the hill.  (Dkt. No. 61-3 at 40-42.)

11      The deputies followed Mr. Slater.  Deputy Hardin notified dispatch: "All right, we're

12  approaching."  (Dkt. No. 61-2 at 61.)  Within 18 seconds of that transmission, Deputy Cougan

13  shot Mr. Slater.  (Id.)  According to Cougan, Mr. Slater "changed his direction and began

14  walking directly towards me at a quick pace with a long stride."  (Dkt. No. 63.)  Deputy Cougan

15  observed, "he was not swinging his arms as he walked, rather he had them both down at his sides

16  firmly with him palms facing away from me, because of this I could not see if he was holding

17  anything or not."  (Id.)  Deputy Cougan did not see any weapon but based on how Mr. Slater was

18  "concealing his palms," he believed that Mr. Slater still had the knife.  (Id.)  Deputy Cougan also

19  believed from his training and experience, "a person with an edged weapon can cover short

20  distances within seconds before a shot can be fired."  Deputy Cougan made eye contact and

21  noticed Mr. Slater had a "thousand yard stare."  (Id.)  Cougan considered the manner in which

22  Mr. Slater moved to be "affirmative."  Deputy Cougan raised his weapon and declared, "SHOW

23  ME YOUR HANDS, GET ON THE GROUND, SHOW ME YOUR HANDS."  (Id., emphasis in

24  original.)  Mr. Slater did not show his hands and continued to walk closer.  (Id.)  Deputy Cougan

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 4

1  shot Mr. Slater.  (Id.)  Mr. Slater fell within two feet of where Deputy Cougan stood.  Mr. Slater

2  died at the scene.  A knife was not found on Mr. Slater.

3      Defendants move for summary judgment on all claims in the case.  (Dkt. No. 60.)  Plaintiffs

4  move for partial summary judgment on the issue of liability and on their claims against the

5  County under Monell v. Department of Social Services, 436 U.S. 658, 690 (1978).

6  **Analysis**

7      A.  Legal Standard

8      On a motion for summary judgment, the court must draw all inferences from the admissible

9  evidence in the light most favorable to the non-moving party.  Addisu v. Fred Meyer, Inc., 198

10  F.3d 1130, 1134 (9th Cir. 2000).  Summary judgment is appropriate where there is no genuine

11  issue of material fact and the moving party is entitled to judgment as a matter of law.

12  Fed.R.Civ.P. 56(a).  The moving party must initially show the absence of a genuine issue of

13  material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The opposing party must then

14  show a genuine issue of fact for trial.  Matsushita Elect. Indus. Co. v. Zenith Radio Corp., 475

15  U.S. 574, 586 (1986).  The opposing party must present probative evidence to support its claim

16  or defense.  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

17  The court defers to neither party in resolving purely legal questions.  See Bendixen v. Standard

18  Ins. Co., 185 F.3d 939, 942 (9th Cir. 1999).

19      B.  Fourth Amendment Claim, Excessive use of force

20      Section 1983 provides a remedy for a plaintiff who proves that a defendant acting under

21  color of state law violated her constitutional rights. Deputy Cougan denies he violated the

22  Constitution.  Defendants argue the Fourth Amendment claim, relating to the use of force, fails

23  because Deputy Cougan's shooting of Mr. Slater was objectively reasonable.  (Dkt. No. 60.)

24

1    Deputy Cougan's decision to shoot Mr. Slater was a seizure within the meaning of the Fourth

2    Amendment, which governs both the lawfulness of a seizure and the means used to accomplish

3    it.  See Tennessee v. Garner, 471 U.S. 1, 7–8 (1985).

4    As in any Fourth Amendment case, the inquiry is whether Deputy Cougan's actions were

5    reasonable, balancing Mr. Slater's Fourth Amendment interests against the government interests.

6    Id.  Reasonableness is evaluated objectively, by asking whether a reasonable officer confronted

7    with the same circumstances would have believed the intrusion reasonable.  The court considers

8    three principal factors to complete that inquiry in an excessive force case.  Espinosa v. City &

9    County of San Francisco, 598 F.3d 528, 537 (9th Cir. 2010).  It evaluates the "severity of the

10   intrusion" by determining the degree of force used.  Id.  It then assesses the government's interest

11   by considering "(1) the severity of the crime; (2) whether the suspect posed an immediate threat

12   to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting

13   to escape."  Id. (summarizing factors from Graham, 490 U.S. at 396).

14   These factors are not exclusive, and the court may consider any factor relevant to the

15   reasonableness inquiry.  Glenn v. Washington County, 673 F.3d 864, 872 (9th Cir. 2011) ("Other

16   relevant factors include the availability of less intrusive alternatives to the force employed,

17   whether proper warnings were given and whether it should have been apparent to officers that

18   the person they used force against was emotionally disturbed.").  For example, the court may

19   consider the plaintiff's culpability in creating the circumstances that led to the use of force.  Scott

20   v. Harris, 550 U.S. 372, 384 (2007).  Ultimately, the court balances the government's interests

21   against the individual's to determine whether the force was reasonable.  Espinosa, 598 F.3d at

22   537.  On summary judgment, the Court views the evidence in the light most favorable to the non-

23   moving party.  Smith v. Hemet, 394 F.3d 689, 701 (9th Cir. 2005).

24

1    At the outset, the Court finds Deputy Cougan used deadly force and intended to do so.

2    Deputy Cougan used an AR-15 rifle to shoot Mr. Slater in his bare chest with a .223 caliber

3    cartridge.  Objectively, this was deadly force.

4    The difficult question is whether the use of deadly force against Mr. Slater was objectively

5    justified.  The Court looks first to the severity of crime the deputies suspected Mr. Slater had

6    committed: domestic violence.  Although in Washington a domestic violence complaint

7    mandates law enforcement make an arrest, it does not follow that the crime is itself serious

8    enough to justify the use of deadly force.  See Smith, 394 F.3d at 702-03.  This is especially true

9    when Deputy Cougan lacked knowledge of the facts surrounding the domestic violence

10   complaint.  He had not for example, interviewed the victim, personally assessed her injuries, or

11   otherwise evaluated the severity of the crime other than knowing it involved domestic violence.

12   The Court next turns to the question of the immediacy of any threat posed by Mr. Slater to

13   law enforcement or to others.  The Court is mindful of several undisputed facts:  Deputy Cougan

14   knew Mr. Slater was suspected of domestic violence, Mr. Slater was in possession of a large

15   knife as he sat on the bench, Mr. Slater was dressed in shorts, flip-flops, and wore no shirt, Mr.

16   Slater was not in possession of the knife when he was shot, only 18 seconds elapsed between the

17   deputies' effort to "contain" Mr. Slater and the shooting, Mr. Slater ignored Deputy Cougan's

18   commands, Mr. Slater walked in the direction of Deputy Cougan before being shot, and the knife

19   was later found on the bench.  But, these facts alone do not establish the reasonableness of

20   Deputy Cougan's actions.  Instead, the Court finds numerous factual disputes for trial.

21   First, the mere presence of a weapon, even a weapon that a suspect is actually

22   brandishing, is not a sufficient basis to use deadly force.  Harris v. Roderick, 126 F.3d 1189,

23   1202 (9th Cir. 1997) (holding, in review of case arising from Ruby Ridge standoff, that directive

24

1 to kill any armed adult male was unconstitutional); <u>Curnow v. Ridgecrest Police</u>, 952 F.2d 321,

2 325 (9th Cir. 1991) ("[O]fficers could not reasonably have believed the use of deadly force was

3 lawful because [plaintiff] did not point the gun at the officers and apparently was not facing them

4 when they shot him the first time.").  Second, there are genuine issues of fact as to whether it was

5 reasonable for Deputy Cougan to believe Mr. Slater had concealed the knife—a large kitchen

6 knife—in his palms.  Likewise, there is a question of fact, which only a jury can resolve, as to

7 whether Deputy Cougan could have seen Mr. Slater's knife was left on the bench before shooting

8 him.  The County argues that video evidence disproves any possibility that Deputy Cougan could

9 have seen the bench from the shooting location.  But, this video was taken in 2013 and there are

10 genuine disputes as to whether the bushes were the same size and shape in 2009 as the video now

11 depicts.  Finally, there is a question of fact as to whether Mr. Slater's body language, including a

12 stare Deputy Cougan described as a "thousand yard stare" or the pace and manner of Mr. Slater's

13 walk, could be reasonably be considered a threat.  The jury could also consider whether

14 alternatives to shooting Mr. Slater with an AR 15 and .223 caliber bullets were available.  <u>See</u>

15 <u>Glenn</u>, 673 F.3d at 872.  And, whether the failure to warn was also unreasonable.  <u>Id.</u>  But,

16 contrary to Plaintiffs' representations, neither of these factors alone warrant granting summary

17 judgment in their favor.

18   Taken in the light most favorable to Plaintiff, a reasonable jury assessing the risk of harm

19 posed by Mr. Slater could discount Deputy Cougan's subjective opinion that Mr. Slater was

20 armed when he was shot.  Nevertheless, by these same facts, a jury could find Deputy Cougan's

21 use of force justified based on the threat posed by Mr. Slater.

22   C. Motion to Strike

23   In its response to Plaintiffs' motion for summary judgment as to Fourth Amendment liability,

24 Defendants' move to strike an expert opinion, arguing it is not based on reasonable methodology.

1    (Dkt. No. 88 at 18.)  Specifically, they argue his methodology cannot be replicated.  The Court

2    finds Mr. Van Blaircom's testimony is unhelpful to the trier of fact and STRIKES the

3    declaration.  Mr. Van Blaircom attempts to raise factual issues wholly separate from his position

4    as a police expert, including what Deputy Cougan could or could not see.  The Court therefore

5    STRIKES the testimony as inadmissible under Fed. R. Evid. 702.

6         D.  Qualified Immunity of Deputy Cougan

7         Defendants argue that, even if Cougan's conduct was unreasonable, he is protected by

8    qualified immunity.  The Court agrees.

9         The question to resolve here is "[t]aken in the light most favorable to the party asserting the

10   injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier v.

11   Katz, 533 U.S. 194, 201 (2001).  Determining whether a defendant officer's use of force was

12   "reasonable" under the Fourth Amendment "requires a careful balancing of the nature and

13   quality of the intrusion on the individual's Fourth Amendment interests against the

14   countervailing government interests at stake."  Graham, 490 U.S. at 396 (internal quotations

15   omitted).  "This analysis requires 'careful attention to the facts and circumstances in each

16   particular case, including the severity of the crime at issue, whether the suspect poses an

17   immediate threat to the safety of the officers or others, and whether he is actively resisting arrest

18   or attempting to evade arrest by flight.'"  Gibson v. County of Washoe, Nev., 290 F.3d 1175,

19   1197 (9th Cir. 2002) (quoting Graham, 490 U.S. at 396).  The Court weighs the circumstances

20   from the viewpoint of a reasonable officer at the scene, not using 20/20 hindsight.  Id.

21        The facts here do not show that an officer in Deputy Cougan's position would have known he

22   was using excessive force.  A right is clearly established if a reasonable officer would understand

23   that his conduct was unlawful under the circumstances that confronted him.  Saucier, 533 U.S. at

24   202.  Above, the Court found material issues of fact exist with respect to the reasonableness of

1   Deputy Cougan's use of force.  The Court recognizes the presence of disputed facts, alone, does

2   not provide a sufficient basis for denying summary judgment on the issue of qualified immunity.

3   (Id.).  In this case, even if Deputy Cougan's actions were objectively unreasonable, the Court

4   cannot say his use of force fell outside the hazy border between excessive and acceptable force

5   such that Deputy Cougan should have believed his actions were unlawful.  Deputy Cougan

6   believed Mr. Slater was armed with a knife, was mentally disturbed, suicidal,  walked at a "quick

7   pace," was not following verbal commands, and yet Deputy Cougan had inadequate space in

8   order to move in another direction to avoid Mr. Slater.  On these facts, the Court finds Deputy

9   Cougan would not have known his shooting of Mr. Slater was unlawful given the situation he

10  confronted.  Ramirez v. City of Buena Park, 560 F.3d 1012, 1020 (9th Cir. 2009).

11      The Court GRANTS summary judgment in favor of Defendants on the issue of qualified

12  immunity and DISMISSES the claims against Deputy Cougan.

13      E.  Fourteen Amendment Claim – Purpose to Harm Unrelated to a Legitimate Law

14          Enforcement Objective

15      Official conduct that "shocks the conscience" in depriving parents of that interest is

16  cognizable as a violation of due process.  Porter v. Osborn, 546 F.3d 1131, 1137 (9th Cir. 2008).

17  This is a more stringent standard than the Fourth Amendment's reasonableness standard.

18  Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 371 n. 4 (9th Cir. 1998).  In

19  determining whether excessive force shocks the conscience, this Court must first ask "whether

20  the circumstances are such that actual deliberation [by the officer] is practical."  Id. at 1137

21  (quoting Moreland, 159 F.3d at 372  (internal quotation marks omitted)). Where actual

22  deliberation is practical, then an officer's "deliberate indifference" may suffice to shock the

23  conscience.  Id.  On the other hand, where a law enforcement officer makes a snap judgment

24

1   because of an escalating situation, his conduct may only be found to shock the conscience if he

2   acts with a purpose to harm unrelated to legitimate law enforcement objectives. Id. at 1140. For

3   example, a purpose to harm might be found where an officer uses force to bully a suspect or "get

4   even." Id.

5       Plaintiffs have no Fourteenth Amendment claim because Deputy Cougan has qualified

6   immunity.  But even if the Court reached the merits, dismissal of the claim is still warranted

7   because the facts of this case fail to meet the threshold for a due process claim.  Because the

8   events surrounding the shooting of Mr. Slater transpired over seconds (approximately 18) and

9   required a snap judgment by Deputy Cougan, the Court applies the purpose to harm standard.

10  The Court finds nothing in the record to support an inference that Deputy Cougan acted with a

11  purpose to harm unrelated to legitimate his law enforcement objectives.  When Deputy Cougan

12  shot Mr. Slater, he was attempting to contain the deceased in order to eventually effect a lawful

13  arrest.

14      The Court GRANTS summary judgment to Defendants on the Fourteenth Amendment claim.

15      F.   §1983 Claims against the County

16      The parties also move for summary judgment on the §1983 municipal liability claims.  The

17  Court GRANTS summary judgment to Defendants.

18      Title 42 U.S.C. § 1983 provides a cause of action for the "deprivation of any rights,

19  privileges, or immunities secured by the Constitution and laws" of the United States.  To state a

20  claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution

21  and laws of the United States, and the alleged deprivation was committed by a person acting

22  under color of state law.  West v. Atkins, 487 U.S. 42, 48 (1988).

23      Municipalities are included as "persons" to whom § 1983 applies and thus may be held liable

24  for causing a constitutional deprivation.  Monell, 436 U.S. at 690.  However, the doctrine of

1    respondeat superior does not apply to 42 U .S.C. § 1983 claims against municipalities.  Pembaur

2    v. City of Cincinnati, 475 U.S. 469, 478 (1986).  In other words, municipal liability is not

3    established merely by showing that a municipal employee committed a constitutional tort while

4    acting within the scope of their employment. See Id. at 478–79.  Instead, liability will attach to a

5    municipality only when "action pursuant to official municipal policy of some nature caused a

6    constitutional tort." Monell, 436 U.S. at 691.  The "official policy" requirement "was intended

7    to distinguish acts of the municipality from acts of employees of the municipality, and thereby

8    make clear that municipal liability is limited to action for which the municipality is actually

9    responsible." Pembaur, 475 U.S. at 479–80.

10       Section 1983 liability may attach to a municipality "only where the municipality itself causes

11   the constitutional violation through 'execution of a government's policy or custom, whether

12   made by its lawmakers or by those whose edicts or acts may fairly be said to represent official

13   policy.'" Ulrich v. City & Cnty. of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002) (quoting

14   Monell, 436 U.S. at 694).  "Where a plaintiff claims that the municipality has not directly

15   inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of

16   culpability and causation must be applied to ensure that the municipality is not held liable solely

17   for the actions of its employee." Bd. of Cnty. Com'rs of Bryan Cnty. v. Brown, 520 U.S. 397

18   (1997).

19       1.  Policy or Custom

20       Plaintiffs complain King County's "toothless" investigations and disciplinary system played

21   a "causal role" in the shooting of Mr. Slater.  As evidence, Plaintiffs' point to the lack of a prior

22   police involved shooting where the County disciplined an officer or found a use of force

23   unjustified.

24

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 12

1    This is not sufficient to establish <u>Monell</u> liability under the law. Plaintiffs must show that the

2    policies were the "moving force" behind the constitutional violation.  <u>See</u> <u>Monell</u>, 436 U.S. at

3    694–95. In other words, Plaintiffs must demonstrate "a direct causal link between a municipal

4    policy or custom and the alleged constitutional deprivation." <u>City of Canton v. Harris</u>, 489 U.S.

5    378, 385 (1989).  The Court acknowledges it is surprising that the County has apparently never

6    found the deadly use of force by one of its officers unjustified.  But, it does not follow that these

7    prior decisions caused Deputy Cougan to shoot Mr. Slater.  And Plaintiffs offer no evidence

8    suggesting Deputy Cougan believed he had free reign to shoot Mr. Slater without repercussion.

9    Instead, he testified to the significant consequences and stigma he believed flowed from internal

10   investigations and complaints.  (Dkt. No. 79-2 at 31.)  Plaintiffs' claims rest on the findings of

11   PARC, which are critical of the internal discipline and investigations related to the use of force

12   polices.  But, the PARC report is insufficient to establish civil liability on Mr. Slater's death:

13   Plaintiffs must also produce evidence showing  these policies or customs were the cause of Mr.

14   Slater's death.  Plaintiffs have failed to do so.  Summary Judgment in favor of Defendants is

15   GRANTED on this claim.

16       2.   Ratification

17       A local government may be held liable for an isolated constitutional violation where a final

18   policymaker "ratifies" a subordinate's actions. <u>Christie v. Iopa</u>, 176 F.3d 1231, 1238 (9th Cir.

19   1999).  To show ratification, a plaintiff must prove that the final policymaker "approve[d] a

20   subordinate's decision and the basis for it."  <u>Id.</u> at 1239.  Thus, "ratification requires both

21   knowledge of the alleged constitutional violation, and proof that the policymaker specifically

22   approved the subordinate's act."  <u>Lytle v. Carl</u>, 382 F.3d 978, 988 & n. 2 (9th Cir. 2004).  "A

23   mere failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983

24

ORDER GRANTING DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT- 13

1  claim." <u>Id.</u> at 987. Whether a particular official has final policymaking authority is a question of

2  state law.  <u>Gillette v. Delmore</u>, 979 F.2d 1342, 1346 (9th Cir. 1992).

3      Plaintiffs assert claims against the County relating to then Sherriff Sue Rahr's finding that

4  Deputy Cougan did not act unreasonably in shooting Mr. Slater.  (Dkt. No. 70.)  Plaintiffs claim

5  Sherriff Rahr's decision incorrectly applied federal law regarding the use of force.  (Dkt. No. 3.)

6  But, on this record, the Court does not conclude Sherriff Rahr knew of a constitutional violation

7  and ratified it.  Rather, the factors she considered in evaluating the internal investigation's

8  conclusion as well as Deputy Cougan's conduct are proper under federal law.  Although none of

9  these factors alone – failure to obey commands, suicidal behavior, and belief by officer that

10  subject was armed – are enough to justify the deadly use of force.  Instead, in this Circuit, these

11  factors may be considered in deciding if the officer acted reasonably.  <u>Graham</u>, 490 U.S. at 396.

12  A jury could not find Sheriff Rahr knew or should have known of the alleged constitutional

13  violation or that a pattern, practice or custom caused the death of Mr. Slater.

14      The Court awards summary judgment to Defendants on the <u>Monell</u> claims.

15      G.  Wrongful death and Survival claims

16      Defendants move for summary judgment as to Plaintiffs' state-law wrongful death claim.

17  Because Deputy Cougan is entitled to qualified immunity, these claims fail.

18      H.  Standing for James Lewis Slater Sr.'s Claims

19      Defendants argue Plaintiff, James Lewis Slater Sr., the deceased's father, lacks standing to

20  sue because he is not a proper statutory beneficiary of the estate.  (Dkt. No. 60 at 30.)  Plaintiffs

21  counter that a parent has standing to assert a Fourteen Amendment claim.  But, because this

22  Court dismissed that claim.  Mr. Slater Sr.'s claim also fails.

23  //

24  //

I.   Putative Damages

Defendants move for dismissal of Plaintiffs' claim for punitive damages.  Because the Court has dismissed any basis for liability, the claim for punitive damages also fails.

**Conclusion**

The Court GRANTS Defendants' motion for summary judgment (Dkt. No. 60) because Deputy Cougan is entitled to qualified immunity and there is no genuine dispute of fact showing the County's policy or custom caused the death of Mr. Slater or the County ratified any unconstitutional conduct.  For these same reasons, the Court DENIES Plaintiffs' motions.  (Dkt. Nos. 65, 67.)

The clerk is ordered to provide copies of this order to all counsel.

Dated this 13th day of August, 2013.

Marsha J. Pechman
Chief United States District Judge